Please call the next case. 311-0779, Timothy Jones v. Hyatt Industries. May it please the Court, Your Honors. My name is Mark Wilson. I represent the appellant in this case, Timothy Jones. The matter involves a work accident that occurred on February 8th of 2008. The accident itself is undisputed. It involved a situation where Mr. Jones was stacking insulation bales when he was struck in the legs by another bale, causing him to twist and fall, injuring his back. An arbitration hearing was held on February 20th, 2009, and the arbitrator awarded medical bills and temporary total disability benefits only up to August 7th of 2008, denied all such benefits after that. Additionally, he found permanency in the amount of 7% ban as a whole. And it's our position that those findings are against the manifest way to the evidence and should be reversed in finding, awarding benefits up to the date of the hearing, as well as remanding the matter back to the Commission with regard to the permanency aspect of the case. Now, Your Honors, what I believe is very important to note is that Mr. Jones never had any prior back problems nor any treatment at all prior to this accident in question. And from the outset of his treatment, he started receiving treatment the very next day. He went to the emergency room and it was documented that he had sharp pain in his low back that was radiating into his leg. And this was documented throughout the medical records, this radiation pain and the constant low back pain. Now, there is just a ton of objective medical evidence. He was referred for a lumbar MRI on March 6th of 2008. That revealed a central annular tear with an associated broad-based disc herniation at L4-5 and also a disc herniation at L5-S1. He was referred to Dr. Snyder, who she interpreted the MRI as indicating a small central annular tear at the L4-5 level, as well as facet arthropathy and mild to moderate foraminal stenosis at the L5-S1 level. And she recommended work restrictions, 10-pound work restrictions and referred him to physical therapy. The MRI was also reviewed by Dr. Dinh on April 9, 2008. Dr. Dinh is a neurosurgeon. He didn't actually see Mr. Jones, but he reviewed the MRI film. And he interpreted it as showing that there was a dark disc at L3-4 and L4-5 and a focal protrusion at L5-S1. And the employer had Mr. Jones see Dr. Michael Dorning, who was their independent medical evaluator. And he saw Dr. Dorning on May 8, 2008. And Dr. Dorning documented the severe back pain and the radiating leg pain. And he interpreted that lumbar MRI as showing an L5-S1 disc herniation. And he said that that could be related to the work injury. Mr. Jones went to a functional capacity evaluation at the employer's request on June 26 of 2008. And it indicated that he was functioning at the medium physical demand level, which fell below the heavy physical demand level of his job. And it also is important that it indicated that he gave maximum effort. Now, it seems like things started going awry on the case, at least from our standpoint, as of July 17, 2008. That was a visit that Mr. Jones had with Dr. Snyder. On that visit, Dr. Snyder indicated that she documented that he still had the low back pain and burning, numbness, and tingling along the buttocks bilaterally. And she kept him on light-duty restrictions temporarily, but indicated that she was going to order a repeat lumbar MRI. And indicated that if there were no other changes, that she was going to release him back to work full duty. And she did... Now, is Snyder her treating physician? Yes, Dr. Snyder... The claimant's treating physician, right? Yeah, I mean... Arguably, she would know the claimant as well as anybody, right? Your Honor, I don't know what happened. Sometimes physicians, you know, when they can't figure out how to heal a person, they'll just somehow assume they're exaggerating their symptoms or just go... We can't make that assumption. I'm trying to look at the record here. There's some conflicting medical evidence, and I agree. There's certainly some evidence to support the claimant's position. Then we have the EMG NCS test results, which would have provided some objective evidence. They're normal. We've got Snyder and Fassett, as I understand it, the claimant's treating and consulting physicians. Each determining that the claimant suffered no severe significant nerve damage. So, can't the Commission believe them over the other doctors? Your Honor, I just... I've had tons of cases where there's been no findings on the nerve... You know, a nerve study, and that didn't mean that there were not objective findings in other aspects of the medical record. Your Honor, what I think is so important here is that Dr. Snyder, she did the repeat MRI, which was done on July 21, 2008. She goes and says that it hasn't changed since the previous MRI. And the thing is, the previous MRI had all those significant findings on it. So, just because there were not a worsening of his condition, just by virtue of the fact that it was still the same as it was back in March of 2008, that's a big deal. Well, in essence, and I don't want to characterize your argument in a certain way, are you saying then that we should, the Commission, we should disbelieve your claimant's treating physician on this issue? Yeah, in this particular instance, yes. Because I think that, you know, unfortunately my client is not the most educated guy in the world when he... Something that I think is important, Your Honor, he was not the most tactful in addressing the situation when he went back to see Dr. Snyder. And one of the things that I think is also important is Dr. Snyder went and released him to return to work without even like a doctor's visit. In other words, she reviewed the MRI on July 21 of 2008, and then just went and released him to return to work on July 23, 2008. So my client was a bit hot when he went in there, and he was upset, you know, because here he's still having these significant problems. And your point is what? That he aggravated his doctor who then presented evidence against him deliberately, or what? He didn't deliberately mean to aggravate his doctor. I'm just saying that I think that she didn't know what else to do and released him to return to work full duty. And my client was upset because he was still having significant problems that he never had before this accident. I only have some testimony from Mr. Budd that there might be a little symptom magnification here. I understand what you mean by that, Your Honor. But I think what is important to note with that is the only evidence of any symptom magnification at all in the whole case is only with regard to Mr. Budd. And, I mean, this is a person who, you know, was working for the company. He was called by the employer as a witness to the case, and I think his testimony has to be taken with a grain of salt, Your Honor. The arbitrator specifically found Mr. Budd to be a credible witness, and the commission affirmed it. So who are we to say he wasn't? Your Honor, I would say that there's no other aspect of the record that indicates that he was magnifying his symptoms at all. In fact, there was two FCEs that were done that indicated that he was giving a consistent maximum effort. There's nowhere else anywhere throughout the medical records of any inconsistent effort or any evidence of symptom magnification. And I think it is so important that even the employer's IME physician interpreted the MRI as finding these significant findings on the MRI. And that MRI was done in March of 2008, you know, shortly after this. And I just think that is very significant. He went on to see, he did attempt to go back to work in early August of 2008, and he attempted on two different occasions, both occasions he ended up going to the emergency room, where the emergency room again documented this radiation pain and radiculopathy. He saw Dr. DePhillips for a second opinion, who... I think we know the evidence. Sure, sure, sure. If somebody asks you, in summary, why is the conclusion opposite to the one the commission has drawn clearly apparent, your simple answer would be what? My answer would be he never had any prior problems at all before this accident. The first time he went for treatment, the very next day, he had consistent pain in the low back that was noted to be severe and radiating leg pain. Those symptoms were substantially similar from that point all the way up to the date of the arbitration. Is this like a chain of events argument you've been talking about? Excuse me? Is this like a chain of events argument? Yes. I mean, there's nothing that would break the chain of events on it. And I think, I don't know how you could possibly say that his condition ended at a certain point. There's also the case, the Holmbright case there with regard to him seeking more medical treatment for a condition that's related to the accident. Even if it doesn't relieve the symptoms, it's something that is a responsibility of the employer under such circumstances. I cited the case of Pabst and Montgomery in the case. Those are cases that I believe are somewhat similar to this case. And in those instances, I think that those were even more cloudy issues than this because in those instances, the petitioner in question did have prior problems whereas in this one, Mr. Jones simply did not. So for those reasons, I don't know if there's any other questions. There's the other issues with regard to, the main issue I heard is the temporary total disability. I'm sorry, the causal connection issue of it. And if you find causal connection, those other issues regarding the TTD and the medical, those will fall in place as well as the need for an extent issue as well. And I cited case law from commission cases kind of comparing. You're not supposed to cite commission cases if you know what you're talking about. Okay. Yes, I'm sorry. I don't have anything else to add at this point. Thank you. Counsel, please. Good morning, gentlemen. My name is Roby Jebranek. I'm here on behalf of the Appellee Harden Incorporated. Our position is that the arbitrator, the commission, the circuit court judge, decisions were not against the manifest weight of the evidence with respect to denial of medical treatment after August 7, 2008, denial of temporary total disability benefits after August 7, 2008, as well as the award for 7% loss of a person as a whole. I think petitioner's counsel at this time is asking the court to interpret medical evidence different than the commission. I mean, yes, there are different medical opinions with regards to the medical evidence we have at this time, but as justice has pointed out, it is clear here that the petitioner was seen by his own treating physician. Dr. Davis is his family care physician. That's number one. Dr. Davis refers him over to Dr. Snyder, who, you know, he relies on her opinions. She's number two. Finds petitioner to be, his MRI findings to be insignificant. Finds that he is capable of returning to work based upon petitioner's additional complaints and demands. She refers him over to a neurosurgeon. There was some delay in getting into Dr. Dean, but eventually he was seen by Dr. Fossett. Dr. Fossett was able to review all the medical evidence as far as the MRI, the EMG, physical exam. When I reviewed the medical evidence myself, what I found the biggest, when I looked at it and I saw the inconsistencies, it was petitioner's subjective history versus the physical exam findings. And when I looked at it... Didn't the MRI show a herniated disc? Depending on who read it. There was an indication of it. I mean, Dr. Eilers, his own hired gun, so to speak, IME did not find a herniated disc based on the MRI. There was indications that there may have been one. But overall, when you look at the board-certified pain management rehab specialist, the board-certified neurosurgeon, our doctor, even Dr. Dorning, who just referenced what the radiologist said, they didn't find it. They didn't find it was significant when you compared that to his physical exam, clinical examination. And that's a big thing, because it just was not adding up. This guy's subjective complaints didn't add up. And to further throw in additional evidence towards that, we have the testimony of his direct supervisor, John Budd. And he saw a petitioner on these days. That petitioner went to the ER and said he had these pains. And the first day he went, you can see, I think it was August 9th, he went to Perry Memorial Hospital. And his first complaint, chief complaint, was a referral to another doctor and wants medications. All right. So there's conflicting medical evidence you've tested. Now your position is, that's the credibility of the evidence, the weight to be given to the evidence is up to the commission. Absolutely. As long as it's based on competent evidence. And I think, you know, it is based on competent evidence here. I mean, you, when you get these treating physicians who have the opportunity, and when I looked at Dr. Phillips, which we question how he even got over to Dr. Phillips located in such a far distance away, regardless of that fact, I didn't even see a physical examination performed by Dr. Phillips in his records. I saw it was based on petitioner's subjective complaints and the MRI. There was no physical exam performed. And there were several physical exam performed by Dr. Davis, his family care physician, Dr. Schneider, who he treated with more than any other doctor, Dr. Dorning, our IME physician, Dr. Eilers performed one, but you could see the change from petitioner. When you read all this physical exam, there's no problem with his gait, and then all of a sudden he sees Dr. Eilers and there's a little issue with that. And then when he returns to work, his supervisor testifies, when he's not in my presence, when he's in my presence, I see him limping around. But when he's not, and he's not aware of my presence, I don't see any problems with him. And when he saw him at arbitration, he felt he overly exaggerated his symptoms there. And the arbitrator was there as well. The arbitrator got to witness this guy firsthand and judge his character and see, and I'm just, my thought is after reading all this evidence and looking at all the medical records, his subjective history did not match up with the physical findings on exam. And his treating physician to evaluate him over and over and over again noticed this. And I don't think they wanted to call out the wrong guy. I mean, they just knew that he had the MRI findings were not as significant as they thought. There was no surgical pathology. Dr. Eilers doesn't even perform surgery. Dr. Fassat, again, is a board certified neurosurgeon. He said there's no surgical pathology. I think petitioner, if we turn back to work, you can see the employer made a very good faith effort in trying to make sure that he didn't do anything overwhelming to cause him to have any problems. I mean, he basically testified that he could sit and stand as needed. And this gentleman just didn't want to do it. And if you look at his complaints about the records, one day he says he can't sit or stand and the next day he says, oh, that's the only thing that relieves my pain is sitting and standing. And walking's the problem. I mean, the guy's all over the place as far as his subjective complaints. And rightfully so, I think it's my belief that petitioner's counsel wants petitioner to change counsels. They send him over to Dr. Phillips. They hire an IME. That's where they're leaning. And Dr. Phillips didn't even perform a physical examination of the guy that I could tell based on the records. If I'm mistaken, please correct me. I think petitioner's reliance on the case law such as PAPS is completely misplaced. I mean, we have in that case, I mean, there was some clear problems and I think it was Dr. Wiring or Wiring, but our doctors did not change their opinions or their treatment plans. For foregoing reasons, there is some conflicting medical testimony. However, there's competent evidence that the Commission, the arbitrator of the Commission and the Circuit Court relied on in determining that this case was not against the manifest weight of the evidence. And I respectfully request this Court affirm their decision that it was not against the manifest weight of the evidence. And I really would like to entertain any questions anybody might have with the additional time I have. Thank you. I'll be very brief. The functional capacity evaluation is the gold standard for determining a person's work restrictions and he underwent two functional capacity evaluations, both of them indicated that he gave maximum effort. And both of them were below his level of the work that was provided. The first one in June 2008 indicated medium level work restrictions. The second one October 2008 indicated at the light to medium level. There's no indication of any intervening accident and are you going to follow what is considered to be the gold standard FCE or are you going to follow this individual who was there and potentially had a biased opinion who only saw him for a couple brief periods of time. It is true that Mr. Jones was in bad shape at the time of the hearing. He testified that the traveling to the hearing, which was about an hour away, increased his symptoms and that's why he was in the manner that he was. Thank you for your time and I believe that the decision is against the manifest weight of the evidence and should be overturned. We'll take the matter under advisement for disposition.